**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **BARBARA J. AUSTIN, ET AL.** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 2:06-CV-357** |
| | § | |
| **BECTON, DICKINSON AND COMPANY, INC. and MCKESSON MEDICAL-SURGICAL, INC.** | § § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are nonparties Rudolf Churner, M.D. and Heritage Eye Center's Response and Supporting Brief to Subpoena and Motion to Quash and Motion for Protective Order (Doc. No. 39); nonparty Barbara Moody's Response and Supporting Brief to Subpoena Motion to Quash and Motion for Protective Order (Doc. No. 50); Defendant Becton Dickinson and Company's Motion to Compel Production of Documents and Answers to Deposition Questions and its Response to Motions to Quash of Rudolf Churner, Heritage Eye Center, L.L.C. and Barbara Moody and Brief in Support (Doc. No. 108); Defendant McKesson Medical-Surgical Inc.'s Motion to Compel Production of Documents and Answers to Deposition Questions and its Response to Motions to Quash of Rudolf Churner, Heritage Eye Center, L.L.C. and Barbara Moody and Brief in Support (Doc. No. 112); and the parties further responses and replies. Having carefully considered the pleadings on file, the applicable law, and the arguments of counsel after a hearing held June 20, 2007, the Court GRANTS nonparties' motions to quash and DENIES Defendants' motions to compel.

**BACKGROUND**

This is a products liability case involving allegations of strict liability, negligence, and misrepresentation against the makers and/or sellers of the "BD™ 60 ml syringe with LuerLok™ tip"

("the syringe"). Defendant Becton Dickinson and Company ("BD") manufactures the syringe and Defendant McKesson Medical Surgical Inc. ("McKesson") distributes the syringe.

On March 7, 2006, Dr. Rudolf Churner ("Dr. Churner") performed an intraocular lens implant surgery on each of the nine plaintiffs (collectively referred to as "the plaintiffs") at Heritage Eye Center ("Heritage"). During those surgeries, Dr. Churner injected a solution of Kenalog and saline into each of the plaintiffs' eyes. Following the surgery, the plaintiffs developed infections and several lost vision in the infected eye. Once the infections were known, Dr. Churner formed a peer review committee, with himself as its chairman, to investigate the cause of the infections. As part of the investigation, Dr. Churner retrieved the syringes he utilized from the trash and sent them to Presbyterian Hospital for testing. Culture tests on the syringe used in the surgery revealed the presence of streptococcus mitis. Another culture test on five unopened syringes revealed one positive test for strep mitis, and the others were negative. Heritage also retained Barbara Moody, R.N. ("Moody") to conduct a quality assurance/peer review analysis and determine the source of the infections.

During the months that followed, Dr. Churner kept in close contact with the plaintiffs. Dr. Churner told the patients, *inter alia*, that: (1) he had performed this particular operation for many years and never had a patient with an infection, (2) he and Heritage were doing an investigation to find the cause of the infections, (3) they were bringing in outside people to help with the investigation, (4) the results of the investigation demonstrated that it was not anything he or his office had done that caused the infections, and (5) the syringe was the cause of the infections.

On September 7, 2006, the plaintiffs filed suit against BD and McKesson asserting that the syringes used in their surgeries caused injury to their eyes. Heritage and Dr. Churner were not sued

as defendants; however, Defendants designated both Heritage and Dr. Churner as responsible third parties pursuant to Chapter 33 of the Texas Civil Practice and Remedies Code.

On November 3, 2006, BD served Notices of Subpoena for Production of Documents to Dr. Churner and Heritage. On November 14, 2006, BD served Notice of Subpoena for Production of Documents on Barbara Moody. Dr. Churner, Heritage, and Moody object to the requests to the extent they seek information protected by the statutory peer review privilege. Allegedly, the documents withheld include the communications of the peer review committee to persons, consultants, agencies, and governmental entities; and the findings of these persons, consultants, agencies, and governmental agencies in response to the investigation by the peer review committee. Defendants contend that the privilege was waived when Dr. Churner disclosed the findings of the peer review committee to plaintiffs to exonerate himself from wrongdoing. The Court conducted a hearing on June 20, 2007, and Heritage submitted the documents at issue for *in camera* inspection.

## APPLICABLE LAW

***The peer review privilege***

The federal government, through the Health Care Quality Improvement Act, 42 U.S.C.A. §§ 11101-11152, and state governments have enacted statutory frameworks "to improve the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior." H.R. Rep. No. 903, 99th Cong., 2d Sess. 2, reprinted in 1986 U.S.C.C.A.N. 6287, 6385 (legislative intent of Health Care Quality Improvement Act). Likewise, the Texas Supreme Court has consistently upheld the peer review privilege, stating that its purpose is to foster free, frank exchange among medical professionals about the professional competence of their peers. *See Irving Healthcare Sys. v. Brooks*, 927 S.W.2d 12,

17 (Tex. 1996).

Two statutes govern the law of peer review privilege in Texas. The first is the medical committee privilege:

> (c) Records, information or reports of a medical committee, medical peer review committee or compliance officer of records, information or reports provided by a medical committee, medical peer review committee or compliance officer to the governing body of a public hospital, hospital district, or hospital authority are not subject to disclosure under Chapter 552, Government Code.
>
> ***
>
> (f) This section and Subchapter A Chapter 160 Occupations Code, do not apply to records made or maintained in the regular course of business...

TEX. HEALTH & SAFETY CODE § 161.032(c) and (f).

A medical committee includes "any committee" of a health care entity including a committee appointed to conduct an investigation. TEX. HEALTH & SAFETY CODE § 161.032. One such "medical committee" can be a "medical peer review committee" as defined by Section 151.002 of the Occupations Code that is formed "to evaluate medical and health care services." TEX. HEALTH & SAFETY CODE § 161.0315(a).

The second is the medical peer review privilege:

> Unless disclosure is required by law, a record or determination of or a communication to a medical peer review committee is not subject to subpoena or discovery and is not admissible as evidence in any civil, judicial or administrative proceeding without waiver of the privilege of confidentiality executed in writing by the committee. The evidentiary privilege created by this subtitle may be invoked by a person or organization in a civil judicial or administrative proceeding *unless the person or organization secures a waiver of the privilege executed by the chair, vice-chair or secretary of the affected medical peer review committee*.

TEX. OCCUPATIONS CODE § 160.007 (emphasis added).

***The issue of waiver***

Waiver is defined as "an intentional relinquishment of a known right." *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). The peer review statute expressly requires that any waiver of the privilege be done in writing by the committee, and, in accordance with the statute, the courts have generally required such.

For example, the Texas Supreme Court found there to be no waiver in a case where a peer review committee's recommendations had been disclosed in response to interrogatories. *See In re University of Texas Health Center at Tyler*, 33 S.W.3d 822, 827 (Tex. 2000). There, the defendant did not initially assert the peer review privilege, but it did object to an interrogatory on the basis that it called for remedial measures. *Id.* Subject to the objection, the defendant provided the requested information, which included the recommendations of the peer review committee. *Id.* The Supreme Court held that this voluntary disclosure did not constitute a waiver of the peer review privilege. *Id.* The court held that the statute provides the means for waiving the privilege, that the burden of proving waiver is on the person seeking access to the documents, and the burden had not been met. *Id.*

Two years later, a state appellate court was faced with a mandamus action after the trial judge reluctantly upheld the peer review privilege. *See In re Tollison*, 92 S.W.3d 632 (Tex. App.–El Paso 2002). There, the plaintiffs alleged the defendant, Dr. Patel, negligently rendered medical services to Don Tollison. *Id.* at 633. During discovery, the plaintiffs learned that documents relating to Dr. Patel's performance had been filed in a federal lawsuit Dr. Patel brought against the hospital for suspending his staff privileges there. *Id.* In responding to the lawsuit, the hospital produced and filed peer review committee records, including evaluations of Dr. Patel's medical skill and

competence. *Id.* The documents were not placed under seal, so that the *Tollison* plaintiffs obtained copies of the peer review committee records by requesting access to the file, as any member of the public could do. *Id.* The plaintiffs then attempted to use the peer review records in cross-examining Dr. Patel during his deposition, but his counsel objected, claiming privilege. *Id.*

Denying the plaintiffs' motion to compel, the trial court found *In re University of Texas Health Center at Tyler* governed. *Id.* Because the Texas Supreme Court had prohibited the use of peer review documents absent a waiver of privilege by the peer review committee, the trial court judge felt bound to follow suit, but opined: "That ruling of the Supreme Court, as I interpret it, binds this court to deny the use of the peer review documents in the case now pending. Believing this ruling is legally correct but forcing an unfair result, I encourage Plaintiffs to seek mandamus relief." *Id.* On mandamus, the *Tollison* court noted that though the documents were undisputedly part of the public record, and obtained through legitimate means, it was also undisputed that plaintiffs had not obtained a written waiver from the medical peer review committee. *Id.* at 634. The court reviewed *In re University of Texas Health Center at Tyler* and, based on that case, concluded it was impossible to find that the trial court in the *Tollison* case clearly abused its discretion in holding as it did. *Id.* at 635. The court elucidated, ". . . [w]e think it important to state what we do not hold here today. We do not hold that the peer review privilege cannot be waived by public disclosure of otherwise privileged documents." Nevertheless, the court held that the trial court did not commit a clear abuse of discretion in finding no waiver and upholding the privilege. *Id.* at 634.

In the case at hand, Dr. Churner and Heritage claims there can absolutely be no waiver of the privilege, because there was no written waiver pursuant to Section 160.007 of the Texas Occupations Code. Dr. Churner and Heritage further claim that Dr. Churner was not solely investigating as a peer

review member, but as a physician who was obligated to investigate and further treat his patients once they developed the infections. They claim that, though admittedly more problematic because Dr. Churner was wearing two hats, the revelations at issue concerned patient care, not the peer review investigation. For example, Dr. Churner claims that the investigation into and the disclosure of the syringe testing was to determine the causative organism of the infection so as to treat the patients.

The evidence before the Court is that Dr. Churner contacted his patients, or their family members, on numerous occasions. His patient records, which he attested to in his depositions, record that Dr. Churner informed his patients that he was investigating the cause of their infections. When testing was complete on the syringes, Dr. Churner revealed to his patients that cultures indicated the presence of streptococcus mitis. To the extent that Dr. Churner told his patients that the causative organism was streptococcus mitis and recommended a course of treatment, the Court might agree that his statements concerned only patient care. But Dr. Churner did not simply find the causative organism, diagnosis the patients and inform them of the treatment he planned in light of the investigative results.

Dr. Churner went beyond treatment and diagnosis and used that information to shift liability from himself. He informed the patients that he was bringing in outside investigators to determine the cause; those investigators found there was nothing he nor Heritage did that contributed to their infections; and that the syringe, manufactured by BD, was the sole cause of their infections.
To the extent that Dr. Churner took the investigative results and went beyond treatment and diagnosis to point the finger at BD, the Court does not agree with his characterization of his statements.

BD argues that Dr. Churner waived the privilege via Dr. Churner's notes in the plaintiffs' medical files, initialed by him, indicating that he informed them of the investigation and that the results pointed away from him and solely to BD. BD also points to Dr. Churner's signature to his sworn deposition testimony, wherein he admitted that he "possibly" or "probably did" tell the patients the investigation pointed to BD. BD argues that Dr. Churner's initials and signature serve as the statutorily required written waiver. The Court finds these "writings" too attenuated to the statute's requirement of a written waiver by the committee. Though BD is correct that the Legislature did not call for specific wording of a waiver, the Court finds there must an affirmative relinquishment of the privilege, where the writing actually addresses the issue of waiver by the required committee members–and not merely initials in patient files or a signature to a deposition–to find such a waiver occurred.

BD also argues that Dr. Churner waived the privilege by the "offensivee use" of disclosing the positive results of the peer review committee's investigation (*i.e.*, stating that only the BD syringe caused the infection and nothing that he or Heritage did caused the plaintiffs' infections) to exonerate himself and his clinic. According to BD, Dr. Churner used the privilege offensively numerous times in telephone conversations with the plaintiffs and their family members, in a pre-suit deposition, in his deposition during the course of this litigation, and by producing the results of the investigative cultures of the syringes by Presbyterian.

Under the offensive use doctrine, a party may waive a privilege applicable to evidence in an instance in which the privilege is being used as a sword rather than a shield. *See Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex. 1993). Because the Court should not find waiver of a privilege

lightly,[1] the Court looks to several factors to find if a waiver occurred: (1) the party asserting the privilege must seek affirmative relief; (2) the privileged information sought must be such that, if believed by the fact finder, in all probability would be outcome determinative of the cause of action asserted (or must go to the very heart of the affirmative relief sought); and (3) disclosure of the confidential communication must be the only means by which the aggrieved party may obtain the evidence. *Id.* If any one of these requirements is lacking, the trial court must uphold the privilege. *Id.*

In this case, BD points to no cases where an offensive use of a privilege can trump a statutorily created express waiver provision. Second, though the confidential disclosures arguably go to the very heart of the matter in this case, *i.e.*, the cause of Plaintiffs' eye infections, and may very well be the only means by which BD may obtain the evidence, the Court cannot say that nonparties Dr. Churner and Heritage are parties seeking affirmative relief in this action. Counsel for BD argues that because Dr. Churner pointed the finger at BD, he escaped being sued. However, escaping suit does satisfy the required element of a party seeking affirmative relief in this action.

Setting aside the "offensive use" doctrine, this case presents numerous facts that weigh in favor of finding waiver. Here, the head of the committee, who also performed the operations that led to the patients' eye infections, publicly and affirmatively disclosed the findings of the committee ostensibly to absolve himself from liability. The Court recognizes that when the head of a committee takes otherwise protected information and discloses this information in an attempt to deflect liability from himself, the purpose of the privilege is arguably thwarted. This is not a case where the

---

[1]The Texas Supreme Court noted that privileges represent society's desire to protect certain relationships. *See Republic Ins. Co.*, 856 S.W.2d at 163. "One of the principles behind privileges is that the harm to the relationship protected by the privilege is greater than the benefit gained through complete disclosure." *Id.* at 163 & n.8 (citing 8 J. Wigmore, *Wigmore on Evidence* § 2285 at 527 (McNaughton rev. 1961)).

physician performing the surgery was an outside observer of an independent peer review committee's investigation or merely called upon to testify to his surgical processes and procedures. Not only was Dr. Churner a member of the peer review committee, he was the chair of the committee and actively headed its investigation. Dr. Churner then utilized the information gathered under the auspices of the peer review committee to exonerate Heritage and himself. For example, Dr. Churner made multiple phone calls to the plaintiffs to tell them that the committee had brought in outside investigators and they concluded it was nothing he or Heritage had done that caused their infections. He also pointed the finger at the syringe as the sole source of liability.

However, the Court also recognizes the important role of the peer review privilege in promoting the quality of medical care. Further, the Court recognizes that a physician must have the ability to conduct ongoing treatment of patients. Most importantly, the statute calls for a waiver be executed in writing by the committee and there is no authority that such a requirement may be overridden by public disclosure. While the Court might find the facts of this case sufficient to warrant waiver on the basis of equity and fairness, the Court is constrained to follow the statute's requirement that a waiver be executed in writing by a member of the committee as set forth in the statute. Although BD calls upon this Court to find a waiver, the Texas Legislature, not this Court, must first explain how this statutorily created waiver can be trumped. In the absence of such an affirmative writing, the Court must uphold the privilege and conclude there was no waiver of the peer review privilege by Dr. Churner and Heritage.

**CONCLUSION**

For the reasons discussed above, the Court hereby **GRANTS** nonparties' motions to quash and **DENIES** Defendants' motions to compel.

**So ORDERED and SIGNED this 18th day of July, 2007.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE